CITIZENS' STATE BANK, a Corporation, v. CHRIST CHRISTIANSON (and Hans Westby, Sole Appellant) et al.

(152 N. W. 346.)

**Mortgages — liens — equitable title — foreclosure — trial de novo.**

This is a trial *de novo* of a mortgage foreclosure action against Christianson and wife, mortgagors of land standing of record in the name of the subsequent grantor, Hans Westby, sole appellant, in which the issue presented is whether Christianson was the equitable owner of the premises mortgaged, as against Hans Westby, legal owner who claims sole and entire ownership. If Christianson is not the equitable owner, the mortgage foreclosed never attached.

*Held* that Hans Westby is the sole owner; that Christianson has no equitable title to said premises; that the mortgage is not a lien and should be canceled of record as to the land involved and this action be dismissed as to Hans Westby; and title be confirmed in him.

Opinion filed April 3, 1915. Rehearing denied April 26, 1915.

From a judgment of the District Court of Pierce County, *Burr, J.,* defendant Hans Westby appeals.

Reversed and dismissal ordered.

*Duncan J. McLennan, Henry G. Middaugh,* and *Rollo F. Hunt,* for appellant.

There is no resulting trust, nor does the doctrine of constructive trust apply, and at most there was only an oral promise to *sell the land,* and such promise, being within the statute of frauds, is not enforceable.

Graham v. Selbie, 8 S. D. 604, 67 N. W. 831; Baker v. Vining, 30 Me. 121, 50 Am. Dec. 617; Pickler v. Pickler, 180 Ill. 168, 54 N. E. 311; Barger v. Barger, 30 Or. 268, 47 Pac. 702; Wallace v. Dunton, 30 S. D. 598, 139 N. W. 345; Webb v. Webb, 130 Iowa, 457, 104 N. W. 438; Crane v. Read, 172 Mich. 642, 138 N. W. 223; Cunningham v. Cunningham, 125 Iowa, 681, 101 N. W. 470; Drake v. McDonald, 91 Neb. 775, 137 N. W. 863; Matt v. Matt, 150 Iowa, 503, 137 N. W. 489; McClenahan v. Stevenson, 118 Iowa, 106, 91 N. W. 925; Veeder v. McKinley-Lanning Loan & T. Co. 61 Neb. 892, 86 N. W. 982; Derry v. Fielder, 216 Mo. 176, 115 S. W. 412; 2 Devlin, Real Estate, 3d ed. §§ 1168, 1175, 1177, 1183; First Nat. Bank v. Mather, 29 S. D. 555, 137 N. W. 51; Mullong v. Schneider, 155 Iowa, 12, 134 N. W. 957; Norton v. Brink, 75 Neb. 566, 7 L.R.A.(N.S.) 945, 121 Am. St. Rep. 822, 106 N. W. 668, 110 N. W. 669; Evans v. Moore, 247 Ill. 60, 139 Am. St. Rep. 302, 93 N. E. 118; Farmers' & T. Bank v. Kimball Mill. Co. 1 S. D. 388, 47 N. W. 402; Cardiff v. Marquis, 17 N. D. 110, 114 N. W. 1088; Hingtgen v. Thackery, 23 N. D. 329, 121 N. W. 839, 16 Cyc. 42.

There is no estoppel in this case. To constitute equitable estoppel it is necessary that the person asserting estoppel shall have done or omitted some act or changed his position in reliance upon the representations or conduct of the person sought to be estopped. Hingtgen v. Thackery, supra; 16 Cyc. 742.

*Albert E. Coger,* for respondent.

It is well settled that the owner of land who stands by and sees another sell it, without making known his claim, is forever estopped to set up his title as against an innocent purchaser. Godeffroy v. Caldwell, 2 Cal. 489, 56 Am. Dec. 360.

An intention to mislead is not a necessary ingredient of the conduct from which an estoppel may arise. Wyatt v. Quinby, 65 Minn. 537, 68 N. W. 109; Shelby v. Bowden, 16 S. D. 531, 94 N. W. 420; Coram v. Palmer, 63 Fla. 116, 58 So. 721; Gregg v. Von Phul, 1 Wall. 274, 17 L. ed. 536; Macomber v. Kinney, 114 Minn. 146, 128 N. W. 1004, 130 N. W. 851.

Neither the statute of frauds nor the various statutory provisions enacted for the protection of a homestead claimant can be held to do away with the general equity doctrine of estoppel *in pais.* Engholm v.

Ekrem, 18 N. D. 185, 119 N. W. 35; Knauf & T. Co. v. Elkhart Lake Sand & Gravel Co. 153 Wis. 306, 48 L.R.A.(N.S.) 744, 141 N. W. 704.

One should not fail to *speak* when the circumstances are such that his silence will work great injury. Hingtgen v. Thackery, 23 S. D. 329, 121 N. W. 840.

In such cases the considerations of common honesty require one to *speak* and assert his claims, to the end that another, about to act to his injury and detriment, may be advised and saved from loss. Gill v. Hardin, 48 Ark. 409, 3 S. W. 519; 2 Pom. Eq. Jur. §§ 803, 818; Dann v. Cudney, 13 Mich. 239, 87 Am. Dec. 755; Truesdail v. Ward, 24 Mich. 134; Gregg v. Von Phul, 1 Wall. 280, 17 L. ed. 537; Allen v. Cannon, 8 Utah, 8, 28 Pac. 868; Farr v. Semmler, 24 S. D. 290, 123 N. W. 838; Cady v. Owen, 34 Vt. 598; Staats v. Wilson, 76 Neb. 204, 124 Am. St. Rep. 806, 107 N. W. 232, 109 N. W. 379; Grigsby v. Larson, 24 S. D. 628, 124 N. W. 859; Gray v. Crockett, 35 Kan. 66, 10 Pac. 457; Richardson v. Beaber, 62 Misc. 542, 115 N. Y. Supp. 821; Jackson v. Burgott, 10 Johns. 461, 6 Am. Dec. 349.

If the owner knowingly and without disclosing his title stand by and permit his property to be mortgaged or sold by another, to one who is, to the owner's knowledge, relying upon the apparent ownership of the person executing the conveyance, such conduct will estop the owner from asserting title against the mortgagee or grantee. Thompson v. Sanborn, 11 N. H. 201, 35 Am. Dec. 490; Crawford v. Bertholf, 1 N. J. Eq. 471; Bryan v. Ramirez, 8 Cal. 461, 68 Am. Dec. 340; Brewster v. Baker, 16 Barb. 613; Bigelow, Estoppel, 5th ed. 586; 11 Am. & Eng. Enc. Law, 2d ed. 427–430; 16 Cyc. 761–764; East Greenwich Inst. for Sav. v. Kenyon, 20 R. I. 110, 37 Atl. 632; Atlanta Nat. Bldg. & L. Asso. v. Gilmer, 128 Fed. 293; 1 Story, Eq. Jur. § 185; Stone v. Tyree, 30 W. Va. 687, 5 S. E. 878.

A fraudulent grantee will not be awarded a prior lien for the amount of disbursements made by him as an incident to the consummation of his fraudulent purpose. Daisy Roller Mills v. Ward, 6 N. D. 317, 70 N. W. 271; Roberts, Fraud. Conv. 591, 597; Humberton v. Howgil, Hobart, 72b; Warneford's Case, 2 Dyer, 193a, 3 Dyer, 294, 295a, pl. 16; Fermor's Case, 3 Coke, 78b; Bean v. Smith, 2 Mason, 252, Fed. Cas. No. 1,174; Sands v. Codwise, 4 Johns. 598, 4 Am. Dec. 305;

Salemonson v. Thompson, 13 N. D. 182, 101 N. W. 320; Beidler v., Crane, 135 Ill. 92, 25 Am. St. Rep. 349, 25 N. E. 655.

Goss, J.   Plaintiff seeks to establish title in defendant Christianson, and to foreclose a real estate mortgage given by Christianson and wife for $2,200 and interest.   Defendants answered separately.   Westby pleads title in himself and denies that C. ever had any interest in the quarter section attempted to be mortgaged by him, and asks that title be quieted against the mortgage sought to be foreclosed.   To this plaintiff replies, alleging C. to be the equitable owner of said premises, and that Westby holds the legal title in trust for C. and procured the deed to himself to defraud and defeat the lien of plaintiff's mortgage.   Plaintiff recovered judgment, from which Hans Westby appeals, demanding a trial *de novo*.

Briefly stated the issues hang upon the following statement of facts: C. came to Pierce county in 1906, where W. was residing.   He moved upon W.'s homestead and farmed it that year.   W. was working on the railroad as a section hand.   Christianson had previously married W.'s sister.   W. was unmarried.   C. farmed W.'s homestead that year on halves, W. furnishing 600 bushels of oats, giving the use of four horses and machinery, $10.60 in cash, and allowing C. to take all the crop that year, W.'s share amounting to $300, leaving C. indebted to him that fall in the sum of $490.60.   Of the foregoing there is no dispute, nor anything upon which to question the good faith of the dealings between W. and C.   In the early spring of 1907 a neighbor, defendant Fjeld, desired to sell an adjoining quarter section and the subject of this litigation.   He talked with C. about his buying it, and got him interested to the extent that C. made a trip to Rugby and attempted to raise the money or credit sufficient to buy the land, but he failed and could get neither money nor credit for the purpose.   During this time and throughout all times involved in this litigation, W. was working on the section in another county and away from his home, except as he would visit it over Sunday.   After it became apparent that C. could not purchase this land, F., who was apparently anxious to sell, went to McCumber in Rolette county to interest W. in purchasing this land, and succeeded in negotiating a deal wherein W. agreed that F. should procure a loan of $1,200 on it and that W. then would purchase it,

assume the mortgage, and pay F. $2,500 above the mortgage, or a total of $3,700 for the farm. On F.'s first visit C. was not along, but on the second visit he accompanied F. On the 23d of April, 1907, a written contract for deed duly acknowledged was entered into between F. and W., wherein F. agreed to sell this land to W., who agreed to purchase it. The first payment thereunder due in December, 1907, was $400, the next one year later, $600, and the balance of $1,500 fell due in three annual $500 payments in December of each succeeding year, 1909, 1910, and 1911. The $2,500 to be paid drew interest at 6 per cent, while the $1,200 mortgage assumed bore 8 per cent, with W. to pay the taxes. This contract was filed for record July 27, 1907. As additional security for the performance of the contract, the payments were evidenced by notes, to secure which W. mortgaged his homestead to F. for $2,500, subject, however, to a prior mortgage thereon of $700. Thus at the commencement of the farming season of 1907 W. had purchased under written contract the Fjeld farm, and had pledged his own homestead as additional security for $2,500 of said purchase price. And this, too, after C. had been unable to purchase said tract. This is important as the basis from which to commence an analysis of the testimony under the claim of the plaintiff that, notwithstanding the deal was thus made, it was in reality also understood as between W. and C. that the former was buying the farm for the latter; or in other words that, while the deal on paper was between F. and W., it was understood as between W. and C. to be actually from F. to C., with W. holding the title as security and as a conduit for title from F. to C., and that whatever W. did in the matter was not for himself, but instead for C. And plaintiff points to the attempt of C. to purchase in the spring of 1907, and his later visit with F. to W., and subsequent events, as proof of its contentions that C. was the beneficiary of whatever was done by W.; and that thereunder, when the contract was performed and even though the deed was taken by W. pursuant to and under the terms of the contract from F. to him, the facts in the case it is contended establish that W. did so merely as trustees of the legal title for C., the alleged equitable owner. And it may be here remarked that the reason for this claim is that two years later C. purchased 120 acres from a third party, paying nothing down, but giving the seller a purchase-price mortgage on the 120 acres and

upon this Fjeld land, then and for two years afterwards still owned by F. The said mortgage is the one in suit.

To pursue the facts in the light of the foregoing contentions, C. farmed W.'s homestead and the Fjeld land for the next five years under an oral understanding whereby one half of the crop raised on W.'s homestead each year, less the thresh bill, should belong to W.; that C. should take all the balance of the crop raised on the homestead and on the Fjeld land, but should pay the taxes, and the interest due upon the Fjeld contract and upon the first mortgage. This left W.'s share of the crop from his homestead free to be applied in reduction of principal of the contract and to meet its payments, leaving the balance of the crop on both quarters with which to pay interest and taxes, with whatever that was left to go to C. as his property and to pay running expenses. W. sold C. his farm machinery and two teams for $600 on time. W. continued to work on the section at $55 per month. Under this arrangement W.'s one half of the grain raised on his homestead netted him the following amounts. For 1907, $502.40; for 1908, $398.90; for 1909, $804.19; for 1910, nothing, a crop failure; for 1911, $319.45. In December, 1911, F. and wife deed to W., which deed was placed of record January 25, 1912, F. having been fully paid off that fall through the mortgaging by W. of his homestead for $1,000, and with the balance from his crop of that year, making a payment by W. to F. for the deed of $1,122.45. The payments made and indorsed upon the contract of purchase were all sent by C. and were all made December 23d of the respective years; to wit, 1907, $400 and interest on $2,500 to that date, $100; 1908, payment on contract $600, with one year's interest on $2,100 to date, $126; 1909, contract payment due of $500, with one year's interest on $1,500, $90. Nothing was paid on the principal in 1910 on account of crop failure, W. paying the interest on the mortgage, $96, and on the $1,000 still due on the contract, $60, or total interest paid of $156 that year, and a like amount of interest was paid in 1911, when the deed was taken. Thus, in addition to the $2,500 paid from four crops raised in the five years, there had been paid in interest on the contract and $1,200 mortgage, at 6 per cent and 8 per cent respectively, $436 interest on the contract and five years' interest at $96 per year, or $480, on the mortgage, or $916 aggregate interest, or a total of $3,416 up to the time title was vested

in W., all of which was paid as a part of the purchase of this tract of land. In addition to this the $700 first mortgage on W.'s homestead was paid off in March, 1910, to pay which $450 was used of the $804.19 proceeds of W.'s share of the 1909 crop. Thus, for the four seasons when crops were raised $1,574.94 of W.'s share of the crop raised on his homestead was turned over on the contract, and in addition thereto in 1908 from his wages he contributed $179.40, and in 1910, $271, or $450.40 more, making an aggregate of $2,025.34 paid by W. individually from crop proceeds of his homestead, and concerning which there can be no dispute. It is true that throughout the cross-examination of W. and C., and throughout the briefs, an inference is cast by respondent that their testimony is unreliable and should be disregarded, but it is inference only, and W. has produced the figures; and one strong corroborative fact that cannot be questioned is that the contract was paid up and it took $3,416 to pay it, of which amount $2,416 came from the crop raised on these tracts and W.'s wages and $1,000 more from the mortgage of W.'s homestead. It is also uncontradicted that in 1908 C. advanced a balance of $22.70 to make up the payment due that year, and in 1909, the year that W.'s $700 mortgage on his homestead had to be met, C. advanced the further sum of $156.40, or an aggregate of $189.10. In addition to this it must be borne in mind that the taxes for five years on these two farms, and which was C.'s burden under the arrangement, must have exceeded $200, so that the aggregate amount to be paid to purchase this farm was above $3,600, including principal, interest, and taxes, and omitting the principal of the $1,200, mortgage thereon assumed and remaining unpaid.

Throughout these years C. and family resided on the Fjeld tract, upon which he had made improvements in buildings, fencing, and planting of trees, and otherwise, all of which was an indirect advantage to W. The land was generally known in the neighborhood as C.'s place,—a fact, however, of no special significance, as C. had at all times resided there. C. had evidently always desired the place as a home, and about the time of the crop arrangement in 1907 an indefinite sort of an understanding was had between the two, in which it was taken for granted that the farm should some day become C.'s and that W. would not sell it to any one else; that C. should have it for the amount

W. was to pay under the contract with F. No attempt was ever made to reduce this understanding to writing.

W. testifies:

I told C. I will be fair with him and will let him have this land for the same price as I paid for it, but I wanted to pay off Fjeld; I wasn't going to do any dealings before Fjeld was paid off.

C. testifies:

Q. You were to pay the interest and taxes on the Fjeld contract for the use of the land?

A. Yes.

Q. Now, when you made those payments of the notes on the Fjeld contract, where did you get the money?

A. I took Hans' crops; he told me to haul it out and pay the notes.

Q. Hans' share of the crops on the homestead?

A. Yes.

Q. How did you pay the interest and taxes?

A. Hauled out some other crop and paid it.

Q. Did Hans tell you he would sell you this land after he got it paid for from Fjeld?

A. He told me I was going to have it when the land was paid for, for the same price he bought it for.

Q. What do you mean by that, that you were to pay him $3,700?

A. Well, I do not know.

Q. The same price?

A. As he bought it for.

Q. You never paid him any money?

A. Not yet.

Nor was a more definite understanding agreed upon between these two brothers-in-law, one of whom, W., was the property owner and benefactor, and the other without means and obliged to rely wholly upon the former. A charge is made in plaintiff's brief on this appeal, based on the harmony in the testimony of the two, that they have at all times been acting in collusion. But it would seem that C.'s attitude in desiring W. to succeed in this litigation would be but the natural

result of the latter's course of kindness toward him through these years. The bone of contention and the origin of this lawsuit is next in order.

In 1909 one Simon Westby (of no relation to Hans Westby) owned 120 acres, known as the Frohold land, near by the Fjeld farm upon which C. was residing. Simon induced C. to purchase the Frohold 120 acre tract for $3,600, under the terms of which purchase C. was to assume a $1,400 mortgage thereon. In addition he executed notes for $2,200 bearing 8 per cent, secured by a purchase price second mortgage for $2,200 given by C. and wife on the Frohold 120 acres and on the Fjeld place, running to Nellie Westby, wife of Simon Westby. This mortgage was dated October 5, 1909, and due in instalment notes of $500 each year, the first due February 1, 1912. These notes were indorsed to plaintiff bank; none of them have been paid. C. defaulted in interest with this foreclosure following in November, 1911. Before C. purchased he consulted Hans Westby, who advised against his buying this land. In the course of the deal Simon Westby and C. went together to Hans Westby, who still advised C. not to buy it, and that he had enough to work without it, and who told Simon not to sell it to C, and "told them both that I didn't want anything to do with it." In this Hans is fully corroborated by C. and in part by Simon Westby as well. Simon testifies that "Hans said that he was against the purchasing of the Fjeld land, and Christianson wanted it, and he was against the proposition; then he said Chris had made good and he would leave it to him." Later the sale was made and the mortgage taken when Hans was not present, and Hans was never asked to sign it. Hans testified as follows: "The first I heard of it was when Simon and Christianson came to Rolette together, as it appeared to me on a visit, and Simon told me first that he was going to sell Chris the three forties, the Frohold land as he called it. I said, 'Is that so ?' And he says, 'Yes;' and I asked him what he wanted to sell that land for to Christianson and at what price, and he said $30 an acre. I told him it seemed a pretty stiff price, and he said it was, but that it was the least he would sell it for. So he didn't say much more, and after a. while he commenced talking about security; whether or not I asked him or he mentioned it first I cannot say, but anyway they was talking about security, and he said, 'I will take security on those three forties and the land that Christianson lives on.' I told him, 'You know that

land is not Christianson's,' I says, 'do you?' He says, 'Yes,' he knows that, 'but it is going to be Christianson's,' he said, 'isn't it?' I said 'Yes, when Christianson pays for it it is going to be Christianson's;' that is all I said to him. Well, he says, 'I am satisfied with that.' This was shortly before the mortgage was taken." And in response to the question as to whether that was the only conversation had, Hans continues: "Just about. I asked him why he wanted to sell this land to Christianson for on such a condition. I asked him, 'What is that mortgage good to you for;' and he said, 'It is not good for anything before Christianson gets the land in his name, but *it is the same as a preliminary mortgage,'* he said, 'as we used to give on a homestead when we first filed on land here.'" It is undisputed that Christianson hesitated to mortgage this land over the remonstance of Hans. He produced the original contract from F. to Hans Westby, and asked the advice in the matter of the lawyer whom Simon took along with him to Christianson's place the day the mortgage was obtained. This is testified to both by Simon and the attorney. There is hearsay testimony of events and conversations there transpiring in the absence of Hans, in which it appears that C. there stated that Hans was interested in the land as security only for his advancements for C., upon the strength of which statements he was advised by the lawyer that he had a mortgageable interest in the premises. . C. and wife then and there executed and delivered the mortgage in the purchase of the Frohold land. At this time there was still $1,500 and interest, or about $1,700, remaining due F. over and above the $1,200 mortgage on the Fjeld land. Thus, when the mortgage was taken it was with full knowledge of the entire situation and claims of the parties, and in the face of the written contract running from F. to W. and with full knowledge that any claim of C. thereto rested in parolé, and upon whether an actual agreement for purchase and sale existed or should be made in the future between Hans and C. It is apparent, too, that soon after this purchase of the Frohold land C. became sick of his deal, as he has never paid a cent of interest or principal. The year following, in 1910, there was an entire failure of crop when the wages to the amount of $271 of Hans were called upon to pay interest, taxes, and seed. In 1911 the proceeds of the Fjeld and Westby farms were again paid in upon the contract, which

with $1,000 more procured by Hans from mortgaging his homestead entirely paid up F.

The plaintiff makes much of the admitted fact of an oral agreement at the time of the purchase of the Fjeld land, to the effect that when $1,500 of the contract price had been paid by W. to F., the latter would discharge the $2,500 mortgage taken as security on W.'s homestead. Plaintiff strenuously contends that this is strong evidence that Hans had an understanding with C. that the latter should be the real owner, and that the mortgaging of the homestead was but the giving of friendly financial assistance. But this discards the testimony of Hans, in which he says that at the time of the purchase he told F.: "I have a $700 note that will come due in about three years from now; if I haven't got the money I won't be in shape to renew that loan when you hold the second mortgage on my homestead; I want you to release that land so that it will put me in shape if I have to, so I can renew my loan on my homestead. He said: 'By that time you will have about $1,500 paid on it, and there will only be about $1,000 left, and it ought to be all right surely,' and I said he would. That was about all." An understanding that a discharge of this mortgage on the homestead could be exacted was but good business, and rather tends to strengthen than discredit Hans, and there is nothing worthy of consideration in the testimony to impeach his motives or his statements, or otherwise discredit his explanation. Simon testifies to having had a conversation in 1908 at Rolette, in the course of which he said that Hans had told him that he (Hans) had taken the contract to himself because he had had to give a mortgage on his land, his homestead, to secure it up, otherwise he said Chris could not have bought the land. "I told him that you were going to get married now, and while it has been all right while you were single it might not be if you were married at the time of the transfer of this land, and I think you ought to transfer the contract to Chris now before you get married. He said, 'I will not turn over that contract until my land is out of soak, until it is released, whether I get married or not, but when my land is clear and out of it I will turn it over to Christianson whether my wife wants to or not.' He asked me if I didn't think Chris had bought a nice farm. I told him I thought he had. He said, 'Chris is a good worker and will get along all right; he will pay for the farm if anybody can.' "

This was a year before Simon dealt with C. for the Frohold farm. Simon also testifies to a conversation had with Hans while he was a juror staying in Rugby in 1906 at Simon's house, in which, the year before the purchase of the Fjeld land and before the matter of its purchase had been considered by anyone, Simon quotes Hans as having said "he would like to fix him [Chris] out with a home." Simon testifies to an attempt in 1911 to get Hans to help out Isaac Westby, a brother, by mortgaging the land of Hans, together with that of Isaac, to pay this plaintiff bank a debt Isaac was owing it, in which also a cousin of Simon's was involved. Both Isaac and Simon went to Rolette to see Hans for that purpose. But Hans turned down the proposition because "he might have to help out Chris again; he had to borrow money on the land to help out; Chris was not able to make it this fall, and if he wasn't able to make it next year then he would have to help him out." Then Simon attempted to get C. to go to the plaintiff bank at Rugby and obtain from it a loan and pay F. off, "and get it all fixed up," and that the bank was "willing to loan him all the money he needed to pay up *both Hans and Fjeld,* and he would be through with Hans; and after he thought the matter over a while he said he thought it was the best thing to do, he would go to Rugby the next day." But in the meantime he saw Hans, who blocked that deal. C. told Simon the next day that, "Hans says your point is no point at all." Then in 1911 Hans sidestepped another of Simon's plans when he procured his $1,-000 loan of another bank than this plaintiff bank, contrary to Simon's arrangements and desires.

It is admitted that C. during the five years in question always marketed all of the crop, including the share of Hans, but both agree that it was always done under the instructions of Hans to haul in the wheat and pay the notes as they fell due each year; also that the contract was left in the possession of C., who sent the money each year to F., and who in 1910 procured from F. a year's extension of the $500 payment due that year on Hans paying the contract and mortgage interest and taxes; and Hans admits that he did not know F.'s address, but left the matter to C., he, Hans, working on the section. Simon's brother Ole testifies to a conversation in 1908 in which Hans told him that C. would come out all right and he had a good crop on his quarter; and on witness asking Hans whether he intended to farm himself he was told,

30 N. D.—13.

"No, not as long as he could keep a good renter, and when he could not get a good renter any more he said he would either sell or quit;" and the next year in the fall Hans told witness that he and C. had had a good crop again, and that C. "went to work and bought another 120 acres, and he also said that he didn't want him to buy any more land until he had cleared up what he did have, and Christianson went ahead and bought it just the same, thought he could win again." The testimony of Simon and Ole Westby as to statements made by Hans are in the main denied by Hans. In 1909 Simon wrote Hans a letter, the first page of which was lost. Under cross-examination Hans produces the second page of it, which reads:

In case that Chris will be able next fall to take up the *contract* without borrowing any money at a higher rate of interest, *I think that would be advisable,* and I for my part will not crowd him for any part of the amount due me until he is in shape to pay it. Just tell Chris to get the amount *he pays the bank* indorsed on the *contract,* and leave it go the way it is until I can spare time to go up with him and have the thing fixed up. *There also should be a settlement between you and Chris, that is, he ought to have something to show that this land is going to be his after he had paid for it,* but I think that will be time enough to fix this up when he pays it, the amount due, in March. You tell him not to worry about it, and that I will look after it, and that it is simply because I cannot possibly spare the time that I cannot at this time be there. . . .

In conclusion, I wish you all a Merry Christmas and a Happy and Prosperous New Year.

Most sincerely yours,<br>Simon Westby.

*I would have written to Chris but I did not know whether he would get it or not.*

S. W.

It is noticeable that this letter is a purely self-serving declaration, written for the future use to which it was applied in this lawsuit. The parts italicized in this opinion plainly disclose the reason why this letter was written to Hans, instead of to Chris. Hans testifies: "I

didn't understand that letter, so I didn't answer it. Didn't pay any attention to it." Another circumstance that should not be overlooked is that the date of the summons in this action is November 27, 1911, and the acknowledgment of the deed of F. and Wife to Hans Westby is dated December 9, 1911, two weeks later, and the service on C. and wife was not made until the 13th of December, 1911, and upon Hans Westby on December 30, 1911. With the balance of the contract price due the 23d of December, 1911, it is plain the mortgagee and the assignor was evidently in touch with the situation, with full knowledge that Hans was mortgaging his farm to get the money with which to procure title in himself, intending that as soon as this was done the final act would immediately take place, that of attempting by an action in foreclosure to subject the property to the lien of the plaintiff's mortgage. The reasonable inference from the testimony is that this suit had been incubating for at least a year before, in disregard of the rights of Hans, and, acting at his peril, Simon finally took the mortgage to his wife upon the land, to which he must have known title would be perfected in another than his mortgagee.

This is a fair and substantially complete *résumé* of the testimony, upon which this farm was held to belong to C. as the equitable owner thereof, and subjected to the rights of this third party mortgagee, and in doing of which $2,025.34 in cash payments coming from the share of the crop belonging to Hans Westby and raised upon his homestead, and inclusive of $450.40 of his wages paid on the contract by him, were utterly cast out and disregarded, while the final payment made by him of $1,122.45 was allowed as a prior lien to that of the mortgagee plaintiff. Certainly Hans Westby was entitled to a prior lien for all that he had paid if he was entitled to one for the last payment made. If it be contended by respondent that Hans is unworthy of belief, the unanswerable fact remains that the money was procured from these two places with which to meet $3,600 in five years paid from four crops, and the testimony is wholly uncontradicted that Hans has gotten none of it, even the crop from his own homestead, except the benefits he may have derived by turning in his half of the crop on his homestead in payment of this contract. It is undisputed that he made the contract. Concede that he knew that C. had attempted to buy the land before he dealt with F. and knew at the time that C. wanted it, nevertheless he,

and not C., purchased it; and his security and credit brought about his purchase. It is undisputed that C., his brother-in-law, had nothing. Plaintiff's own proof that C. was unable to buy establishes that, as does the uncontroverted fact that, when Hans purchased, C. was owing him $490.60 for sustenance and farming expenses of the previous season. The man with substance was Hans, who had a steady wage income of $55 per month the year around, and who foresaw that by the purchase of this farm he could not only help his brother-in-law, already heavily indebted to him, but himself as well. He took a chance that C., a good worker, would assist and thus help both. Respondent's contention, which must be found to be established as a basis for this action, that Hans purchased, though in his own name, for his impoverished brother-in-law as a gift over the above indebtedness already owing him, with Hans contributing for five years the entire crop on his homestead to boot, inasmuch as it has all been turned in for five years on the contract while he worked on the section, it would seem should not merit credence. Either Hans dealt for himself or, as respondent contends, whole-heartedly for C. and then later, when he saw that the benefits of his charity were going to Simon's wife, changed his mind and entered into a conspiracy with C. his beneficiary to retain the farm. Certainly the mortgagee comes into this case with the burden of proof upon it, and the proof should be by facts proven and established, not by mere inferences and innuendoes amounting at the most to little more than a suspicion; and this too when plaintiff must first establish at the threshold of this case that Hans acted purely as a benefactor to C., with the result that the latter acquired equitable title, the fruits of which he has frittered away by mortgage assigned to this plaintiff, which would avail itself thereby of the results of the original alleged charity of Hans to C. Then, again, if it be assumed that every word of competent testimony offered for the plaintiff is true, still there is no case for it, because it has not established in the face of the written documents contracting for and deraigning title to Hans Westby, a definite agreement at all wherein Hans was ever to transfer title to C. Plaintiff is put in the position of being obliged to discredit and cast out every word of testimony contrary to its interests, and claim, nevertheless, as the Gospel truth every syllable in the record from the same witnesses in its favor. Even if this is done, as was evidently the course pursued in

the trial, nevertheless plaintiff, taking with full notice and knowledge presumed in it, has shown no right to relief, because the evidence fails to establish to any reasonable certainty when, how, and for what consideration C. ever became invested with any claim to equitable title to this land. There is not only in such respects a failure of proof, but all the proof, except barest inference, negatives any equitable title in C. .

Much is made of the fact that October 27, 1911, found C. in debt to Hans Westby in the sum of $1,478, for which amount a chattel mortgage was that day taken on C.'s personal property, including horses and machinery. When questioned as to what the items were composed of, Hans itemized the amount as follows: "In 1906 he got 600 bushel of oats, 30 cents a bushel amounting to $180; my share of the crop in 1906, $300; cash $10.60; 5 per cent interest and interest on this at 8 per cent, $196, four horses and machinery (sold in 1907 to C.) $600 and four years' interest on that $192-$1,478." This is attempted to be discredited by a showing that in 1908 C. had advanced $22.70 to make up the payment for that year, and in 1909, $156.40, or a total of $179.-10; and it is admitted that these items, and the improvements made on the Fjeld farm were not taken into consideration in computing the $1,478 indebtedness. That it was not casts no doubt upon the testimony, as the proof is ample that these two men have never dealt closely with each other. And probably foreseeing that, through the intermeddling of others in their affairs, an attempt might soon be made to collect of C. on the Frohold mortgage indebtedness, these two parties adjusted the indebtedness of six years of dealings at the above figure and secured its payment by chattel mortgage. It was not to their discredit that they did so. It was not in fraud of creditors, but merely the giving of a preference of one creditor over another. Some comment is made on the fact that Hans did not bring with him his book of original entry, but instead a note book upon which he had noted many of the transactions, and also that he did not produce some checks to substantiate his testimony. This is trivial. There is nothing to show that the book of original entry could not have been produced had it really been desired, and as to the checks the burden was not upon Hans to corroborate his assertions, apparently frank and straightforward, but instead

upon the plaintiff to establish its case by something besides mere negative testimony.

Respondent has attempted to invoke an estoppel against W. and in favor of the mortgagee and this assignee thereof, and has quoted law to the effect that "the owner of land who stands by and sees another sell it without making known his claim is forever estopped from setting up his title against an innocent purchaser." There are no facts upon which to base any such estoppel. The testimony is all to the effect that the mortgagee had full knowledge of Hans Westby's interests; that she, through her husband, dealt with knowledge of every fact, and knew that Hans was in position to consistently claim to be the purchaser and the only real party in interest. All the testimony to the contrary comes from alleged conversations had with C. in the absence of Hans, or from at the most ambiguous statements in casual conversation of Hans to interested parties; while plaintiff's testimony from its own witnesses establishes that Simon was told by Hans that C. had no interest in the land, but that on the contrary it belonged to Hans. Not only that, but C. produced to Simon the contract running to Hans as purchaser before the deal, and hesitated to deal until it became necessary that a lawyer be employed to put this transaction through, and in the course of which, in the presence of Simon, his attorney explained to C. that the mortgage would merely cover any interest in the land that C. might have. The mortgagee parted with nothing in reliance upon any act or word of Hans or C., but instead dealt at her peril. If the testimony be taken at face, and the same deductions drawn in weighing the testimony as would be indulged in under ordinary circumstances, it would not be unfair to say that the presumptions are strong that Simon was fully aware of the exact situation for at least a year before the sale of the Frohold place and the taking of the C. mortgage, and regarded the same as what has been characterized as a "preliminary mortgage" which might be good should Hans at some future time sell the place to C. that the term "preliminary mortgage" was used is a circumstance against plaintiff, as it has a certain significance all its own to anyone who has lived in frontier settlements. He therefore knew he was taking a chance, and took it with knowledge that it might or might not in the future avail as security. As heretofore remarked, any rights of plaintiff would necessarily not only be subject

to $1,122 merely, the last payment made by Hans, but also $2,025 in addition thereto, which the proof overwhelmingly establishes as having been paid by Hans from his means for his deed. In other words Hans Westby's interests, even under the plaintiff's contentions, could not be less than $3,147.79, together with 7 per cent interest on each payment from the date it was made to date of judgment, should plaintiff possess a right of recovery, as plaintiff would necessarily have been compelled to put in that amount to have acquired title in C., conceding him to have been, as it claims he was, the real purchaser (which fact is negatived by the testimony). When this mortgage was taken, the contract was before the mortgagee, who was charged with actual notice of all past payments made by Hans Westby as well as constructive notice, as the contract was recorded the year it was taken, in 1907. Then, too, at that time, in the neighborhood of $1,800 was necessary to perfect title under the contract for deed, so that, if Hans Westby had never made another payment, that amount and interest would necessarily have been paid by the mortgagee. Respondent in its brief makes a claim of collusion between Hans and C., and asserts that in some way Hans is a fraudulent grantee, and "respectfully urge that it is not consonant with equity and justice that Hans Westby be awarded a prior lien upon this property in the sum of $1,122.45, together with interest." Thus does the respondent complain of the action of the trial court in allowing Hans Westby a prior lien for the last payment, concededly made by him from his own property, to put title where plaintiff could assert a claim to it. Had not this payment been made, plaintiff would have been forced to make it before it could have even claimed a mortgage lien attached to the property. It is difficult to see how the fact that Hans put in his money in the face of a pending lawsuit to enable title to vest in him that plaintiff might make its claim can be said to be fraudulent, or any badge of bad faith on his part. While many cases have been cited by counsel, it is unnecessary to consider them. The facts decide this case adversely to the plaintiff. The preponderance of the proof is not in favor of the claims of plaintiff, but against them. Before C. could be held to be the equitable owner of these premises standing of record in the name of Hans Westby, the proof should be clear and convincing that C. is the equitable owner, the real purchaser. The evidence establishes the contrary, and that the proof of the plaintiff

is insufficient to raise any substantial question but what the written contract and the deed evidence the actual situation. Hans Westby is the owner. C. has no claim in equity to this land.

It is directed that judgment be entered quieting title to the land in suit in Hans Westby, and canceling as a cloud upon his title the mortgage in question, executed by C. and wife to Nellie Westby and assigned to plaintiff bank; that plaintiff's complaint be dismissed as without merit; and that appellant Hans Westby recover of plaintiff and respondent judgment for his costs and disbursements both on the trial of this case and on his appeal, as provided by law. The District Court will vacate the judgment entered, including the findings, conclusions, and order upon which the same is based, and enter judgment in conformity with this opinion.